UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

SUZANNE S. LEGG,

                Plaintiff,

    v.                            **DECISION AND ORDER**
                                  **06-CV-0167 (VEB)**

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

## Introduction

1.      Plaintiff Suzanne S. Legg challenges an Administrative Law Judge's ("ALJ") determination that she is not entitled to supplemental security income benefits ("SSI"), or disability insurance benefits ("DIB"), under the Social Security Act ("the Act").  Plaintiff alleges she has been disabled since September 6, 2001, because of heart disease, depression, and substance addiction.  Plaintiff has met the disability insured status requirements of the Act at all times pertinent to this claim.

## Procedural History

2.      Plaintiff filed an application for SSI and DIB on September 26, 2003, alleging an onset of disability of September 6, 2001.  Her application was denied initially and, under the prototype model of handling claims without requiring a reconsideration step, Plaintiff was permitted to appeal directly to the ALJ.  See 65 Fed. Reg. 81553 (Dec. 26, 2000).  Plaintiff filed a timely request for a hearing before an ALJ, and on July 27, 2004, Plaintiff, accompanied by her attorney, appeared and testified before ALJ Richard R.

Pietrowicz.  Also testifying at the hearing were Richard Legg, Plaintiff's

husband, and Esperanza DiStefano, a Vocational Expert (VE).  The ALJ

considered the case *de novo* and on November 19, 2004, issued a decision

finding that Plaintiff was not disabled.  Plaintiff requested the Appeals Council

review the ALJ's decision.  On June 3, 2005, the Appeals Council denied

Plaintiff's request for review.

3.      On February 2, 2006, Plaintiff filed a Civil Complaint challenging

Defendant's final decision and requesting the Court review the decision of the

ALJ pursuant to Section 205(g) and 1631(c) (3) of the Act, modify the

decision of Defendant, and grant SSI or DIB benefits to Plaintiff.[1]  The

Defendant filed an answer to Plaintiff's complaint on September 16, 2006,

requesting the Court to dismiss Plaintiff's complaint.  Plaintiff submitted

Plaintiff's Brief requesting that the Commissioner reverse and remand the

ALJ's decision on October 31, 2006.  On March 28, 2007, Defendant filed a

Memorandum of Law in Support of the Commissioner's Motion for Judgment

on the Pleadings[2] pursuant to Rule 12(c) of the Federal Rules of Civil

Procedure.  After full briefing, the Court deemed oral argument unnecessary

and took the motions under advisement.

## Discussion

### Legal Standard and Scope of Review:

---

[1] The ALJ's November 19, 2004, decision became the Commissioner's final decision in this case when the Appeals Council denied Plaintiff's request for review.
[2] Although no motion for judgment on the pleadings was filed, the moving party was excused from such filing under General Order No. 18, which states in part: "The Magistrate Judge will treat the proceeding as if both parties had accompanied their briefs with a motion for judgment on the pleadings…"

4.      A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled.  See 42 U.S.C. § 405(g), 1383 (c)(3); Wagner v. Sec'y of Health and Human Servs., 906 F.2d 856, 860 (2d Cir. 1990).  Rather, the Commissioner's determination will only be reversed if it is not supported by substantial evidence or there has been a legal error. See  Grey v. Heckler, 721 F.2d 41, 46 (2d Cir. 1983); Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).  "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971).  Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.  See Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982).

5.      "To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Williams on Behalf of Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988).  If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]."  Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992).  In other words, this Court must afford the Commissioner's

determination considerable deference, and may not substitute "its own

judgment for that of the [Commissioner], even if it might justifiably have

reached a different result upon a *de novo* review."  <u>Valente v. Sec'y of Health

and Human Servs.</u>, 733 F.2d 1037, 1041 (2d Cir. 1984).

6.     The Commissioner has established a five-step sequential

evaluation process to determine whether an individual is disabled as defined

under the Social Security Act.  <u>See</u> 20 C.F.R. § 404.1520, 416.920.  The

United States Supreme Court recognized the validity of this analysis in <u>Bowen

v. Yuckert</u>, 482 U.S. 137, 140-142, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119

(1987), and it remains the proper approach for analyzing whether a claimant

is disabled.

7.     This five-step process is detailed below:

> First, the [Commissioner] considers whether the claimant is currently
> engaged substantial gainful activity.  If he is not, the [Commissioner]
> next considers whether the claimant has a "severe impairment" which
> significantly limits his physical or mental ability to do basic work active-
> ties.  If the claimant has such an impairment, the third inquiry is whether,
> based solely on medical evidence, the claimant has an impairment
> which is listed in Appendix 1 of the regulations.  If the claimant has
> such an impairment, the [Commissioner] will consider him disabled with-
> out considering vocational factors such as age, education, and work
> experience; the [Commissioner] presumes that a claimant who is
> afflicted with a "listed" impairment is unable to perform substantial gain-
> ful activity.  Assuming the claimant does not have a listed impairment,
> the fourth inquiry is whether, despite the claimant's severe impairment,
> he has the residual functional capacity to perform his past work.  Finally,
> if the claimant is unable to perform his past work, the [Commissioner]
> then determines whether there is other work which the claimant could
> perform.

<u>Berry v. Schweiker</u>, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam); <u>see</u> <u>also</u>

<u>Rosa v. Callahan</u>, 168 F.3d 72,77 (2d Cir. 1999); 20 C.F.R. § 404.1520.

8.      While the claimant has the burden of proof as to the first four steps, the Commissioner has the burden of proof on the fifth and final step.  <u>See</u> <u>Bowen</u>, 482 U.S. at 146 n.5; <u>Ferraris v. Heckler</u>, 728 F.2d 582 (2d Cir. 1984). The final step of this inquiry is, in turn, divided into two parts.  First, the Commissioner must assess the claimant's job qualifications by considering his physical ability, age, education, and work experience.  Second, the Commissioner must determine whether jobs exist in the national economy that a person having the claimant's qualifications could perform.  <u>See</u> 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(f); <u>Heckler v. Campbell</u>, 461 U.S. 458, 460, 103 S. Ct. 1952, 1954, 76 L. Ed. 2d 66 (1983).

9.      In this case, the ALJ made the following findings with regard to factual information as well as the five-step process set forth above: (1) Plaintiff met the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision (R. at 26);[3] (2) Plaintiff has not engaged in substantial gainful activity since the alleged onset of disability (R. at 26); (3) Plaintiff's impairments are considered "severe" based on the requirements in the Regulations 20 C.F.R. §§ 404.1520 and 416.920 (R. at 26); (4) These medically determinable impairments do not meet or equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4 (R. at 26); (5) Plaintiff's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision (R. at 26); (6) Plaintiff retains the residual functional capacity to

---

[3] Citations to the underlying administrative are designated as "R."

lift and carry 20 pounds occasionally, 10 pounds frequently; stand and walk 6

hours in an eight-hour workday; sit 6 hours in an eight-hour workday; with

work performed in a hazard-free and temperature-controlled environment;

and tasks being simple and repetitive with minimal social contact (R. at 26);

(7) Plaintiff is unable to perform any of her past relevant work (20 C.F.R. §§

404.1565 and 416.965) (R. at 26); (8) Plaintiff is a "younger individual" (20

C.F.R. §§ 404.1563 and 416.963) (R. at 26); (9) Plaintiff has a "limited 11th

grade education" (20 C.F.R §§ 404.1564 and 416.964) (R. at 26); (10) Plaintiff

has no transferable skills from any past relevant work to her residual

functional capacity as determined herein (20 C.F.R. §§ 404.1568 and

416.968) (R. at 26); (11) Plaintiff has the residual functional capacity to

perform a significant range of light work (20 C.F.R. §§ 404.1567 and 416.967)

(R. at 26); (12) Although Plaintiff's additional limitations do not allow her to

perform the full range of light work, using Medical-Vocational Rule 202.18 as

a framework for decision-making, there are a significant number of jobs in the

national economy that she could perform.  Examples of such jobs include

work as an order clerk, messenger, and mail clerk (R. at 26); and (13) Plaintiff

was not under a "disability," as defined in the Social Security Act, at any time

through the date of this decision (20 C.F.R. §§ 404.1520 and 416.920) (R. at

26).  Ultimately, the ALJ determined Plaintiff was not entitled supplemental

security income benefits, or to a period of disability and disability insurance

benefits, as set forth in sections 216(i) and 223(d) of the Social Security Act

(R. at 27).

**Plaintiff's Allegations:**

10.    Plaintiff alleges four challenges to the Commissioner's decision that Plaintiff was not disabled during the relevant time frame for her claim.  <u>See</u> Plaintiff's Brief, pp. 1-2).  Of Plaintiff's four challenges, two allege errors made by the Appeals Council in failing to review and vacate the ALJ's decision, and in failing to remand the matter for further administrative proceedings.  <u>Id</u>. Plaintiff's civil action before the Court may challenge only the determination of the ALJ that Plaintiff was not under a disability during the relevant time frame, and not the failure of the Appeals Council to remand the case for further administrative proceedings.  <u>See</u> 42 U.S.C. § 405(g).  Plaintiff's civil action must necessarily be directed at the decision of the ALJ, and not the failure of the Appeals Council to remand for further administrative proceedings.  <u>Id</u>. Thus, where appropriate, the Court will consider each of Plaintiff's **_claims_** as though they had been properly framed with respect to the decision of the ALJ.

Plaintiff's third challenge to the final decision of the Commissioner asserts that the Appeals Council failed to review the ALJ's decision based upon what she considers to be new and relevant evidence specific and material to the time period of her claim.  The regulations provide that the Appeals Council will consider new and material evidence only when it relates to the period on or before the date of the ALJ's decision.  <u>See</u> 20 C.F.R. §§ 404.970(b) and 416.1470(b); <u>see also</u> <u>Accord</u> <u>Perez v. Chater</u>, 77 F.3d 41, 45 (2d Cir. 1996).   Plaintiff's fourth challenge to the final decision of the Commissioner is that the hearing transcript is incomplete because the

transcriber marked sections of the hearing transcript as "inaudible," apparently because of the poor quality of the audiotape.

Each of Plaintiff's challenges will be discussed in sequence below. However, prior to addressing Plaintiff's challenges, the Court will present a summary of her extensive medical history, as an understanding of this history is essential to understanding the decision of the Court.

**Plaintiff's Medical History During to the Time Frame for Her Claim:**

11.    On September 4, 2001, Plaintiff was admitted to Benedictine Hospital by Dr. Amin Elashker complaining of recurring episodes of chest and arm pain (R. at 158-159).  Her physical examination was essentially unremarkable; however, her EKG showed T-wave inversion on the precordial leads, with no other changes (R. at 159).  Dr. Elashker recommended emergency treatment with nitro paste, beta blockers, and heparin, along with a full cardiology evaluation.  Id.

Plaintiff underwent a full cardiology examination by consulting physician, Dr. Dineshkant Parikh, on September 4, 2001 (R. at 160-161). Once again, Plaintiff's physical examination was unremarkable, although her EKG showed non-specific T-wave abnormality with a regular sinus rhythm (R. at 161).  Dr. Parikh's impression was that Plaintiff had probable non-cardiac chest pain, but recommended an echocardiogram and Doppler study.  Id.

Plaintiff underwent an echocardiogram and Doppler study on September 5, 2001 (R. at 162-164).  While these tests did not reveal significant heart wall motion abnormalities, Plaintiff's EKG developed

anterolateral STT-wave changes during her hospitalization (R. at 165).

Consulting cardiologist, Dr. Eric Roccario, determined Plaintiff had been

ruled-in for an anterolateral wall, non-Q wave myocardial infarction,[4] and

recommended cardiac catheterization (R. at 165-166).

On September 6, 2001, Plaintiff underwent left heart

catheterization, with a coronary angiogram, and a left ventriculogram (R. at

167-169).  Based on the results of this examination, Dr. Roccario assessed

Plaintiff with three vessel non-obstructive coronary artery disease, with

irregularities in the inner coating of the vessels, and mildly reduced left

ventricular function (R. at 169).  Dr. Rocarrio suggested Plaintiff's medical

therapy be intensified.  Id.

Plaintiff followed up with her new treating cardiologist, Dr. Gary

Cohen, on September 21, 2001 (R. at 370-371).  Plaintiff's physical

examination was unremarkable, and Dr. Cohen opined her myocardial

infarction was probably due to spasm (R. at 371).  He revised Plaintiff's heart

medications and strongly recommended she stop smoking because, Dr.

Cohen noted, "this is one of the main causes of spasm."  Id.

On January 14, 2002, Plaintiff attended her regular follow-up visit

with Dr. Cohen (R. at 268-369).  Since her last visit, Plaintiff reported she had

had three episodes of chest pain requiring nitroglycerin treatment (R. at 368).

Plaintiff's physical examination was normal, although the doctor noted her

blood pressure was elevated.  Id.  He also recorded that in addition to taking

Tiazac and Altace for high blood pressure, Lipitor for high cholesterol, and

---

[4]      A myocardial infarction is commonly referred to as a "heart attack."

Indur for angina symptoms, Plaintiff was also taking Ambien, Ativan, and Pepcid.  Id.

Plaintiff was examined by Dr. Cohen again on April 26, 2002 (R. at 367).  She reported occasional chest pain, but her physical examination was otherwise normal.  Id.

On September 3, 2002, Plaintiff was examined by her primary care physician, Dr. Susan Allen (R. at 177).  Plaintiff complained of back pain, and Dr. Allen recommended 30 days of treatment with Lortab.  Id.

Plaintiff returned for a follow-up visit with Dr. Cohen on September 6, 2002 (R. at 363-364).  He noted she was being treated for back problems by a different physician, but found she was "without cardiac symptoms of chest discomfort, palpitations, syncope, pedal edema, orthopnea, or paroxysmal nocturnal dyspnea" (R. at 363).  Plaintiff reported she experienced periodic shortness of breath and lightheadedness.  Id.  Her physical examination was otherwise unremarkable (R. at 363-364).  Once again, Dr. Cohen recommended Plaintiff stop smoking (R. at 364).

On September 13, 2002, Plaintiff was examined by Dr. Allen (R. at 176).  Plaintiff wanted to discuss the results of a stress test she had taken earlier in the day, and also wanted the doctor to refill a prescription for Ativan. Id.  Dr. Allen agreed to refill the Ativan prescription for one month only, until Plaintiff could meet with her psychiatrist.  Id.  The doctor advised Plaintiff she would not refill the prescription again after October 15, 2002.  Id.  Dr. Cohen,

who examined the results of Plaintiff's stress test, reported her stress test was negative at 90 percent of maximum heart rate (R. at 331).

Plaintiff contacted Dr. Allen's office on October 17, 2002, with an urgent request for refills of Ativan and Ambien (R. at 174).  She advised Dr. Allen that her psychiatrist was out of town and could not order the refill.  Id. Dr. Allen told Plaintiff to contact the back-up psychiatrist, and if she could not contact that physician, to go to the emergency room.  Id.  Dr. Allen refused to prescribe any additional refills for Ativan.  Id.

On October 17, 2002, Plaintiff also contacted Dr. Cohen with an urgent request for treatment (R. at 326-327).  She complained of palpitations, dizziness, and shortness of breath, and told the doctor these symptoms abated when she took Ativan (R. at 326).  Plaintiff's physical examination was unremarkable, and Dr. Cohen opined Plaintiff's symptoms might be related to anxiety or perimenopause (R. at 327).  Dr. Cohen recommended Plaintiff continue with her current medications, and did not prescribe Ativan.  Id.

Plaintiff was examined by her primary treating physician, Dr. Allen, on November 7, 2002 (R. at 173).  Once again, Plaintiff demanded Ativan, and again, the doctor refused to refill the prescription.  Id.  Dr. Allen advised Plaintiff to "see a psychiatrist immediately."  Id.

On November 26, 2002, Plaintiff underwent a screening visit for admission to an outpatient therapy program at Greene County Mental Health Center (R. at 408).  Plaintiff complained of depression that included symptoms of daily crying spells, irritability, anger, and self-isolation.  Id.  Upon

11

examination, Plaintiff was alert, oriented, non-psychotic, and non-suicidal.  Id.

She reported to the therapist she had not used cocaine since October 2001,

and had not consumed alcohol since May 2002.  Id.  She reported to the

therapist that she had tried Effexor and Zyprexa, but these medications did

not relieve her symptoms.  Id.  Plaintiff again insisted on treatment with

Ativan, and the therapist noted "her insistence on Ativan needs to be

assessed."  Id.

Plaintiff was examined by treating physician, Dr. Tamton Mustapha,

on January 15, 2003, when she complained of persistent heartburn (R. at

386).  The results of Plaintiff's physical examination were unremarkable,

although Dr. Mustapha recommended she undergo endoscopy.  Id.

On January 31, 2003, Plaintiff underwent upper endoscopy (R. at

385).  Dr. Mustapha found she had mild to moderate erosions of the lower

end of the esophagus, but no ulcerations were visible.  Id.  The doctor

recommended conservative treatment for reflux esophagitis.  Id.

Plaintiff was examined by consulting psychiatrist, Dr. Michael

Gregg, prior to admission to an outpatient therapeutic program at Greene

County Mental Center (R. at 406-407).  Upon examination, Plaintiff was noted

to be "wary," but "fully communicative," and "relaxed" (R. at 407).  Dr. Gregg

observed no signs of hallucinations, delusions, bizarre behaviors, or other

indicators of psychosis.  Id.  He found Plaintiff's thinking logical, with

appropriate thought content.  Id.  The doctor recorded Plaintiff's memory for

immediate, recent, and remote events was intact.  Id.  Plaintiff told Dr. Gregg

she had abused cocaine for years, consuming "typically a gram…at least daily" (R. at 406).  He recommended a course of psychopharmacology, along with substance abuse counseling, cognitive therapy, and behavioral therapy (R. at 407).

Plaintiff was treated by Dr. Gregg again on March 19, 2003 (R. at 403-404).  The doctor noted Plaintiff has stopped taking Zoloft, claiming it made her feel "shaky and anxious" (R. at 403).  Plaintiff's mental status examination was unremarkable, and the doctor recorded Plaintiff's cocaine dependence was in remission.  Id.  Dr. Gregg prescribed the anti-depressant Celexa (R. at 404).

On April 28, 2003, Plaintiff was taken by paramedics to the emergency room of Columbia Memorial Hospital (R. at 300-312).  The Plaintiff reported to the emergency room attendants that she "drank wine with my Ativan,[5] Celexa…feeling depressed" (R. at 300).  Plaintiff was given a thorough physical examination, including blood tests (R. at 303-312).  The emergency room attendant noted Plaintiff appeared intoxicated, with blurry red eyes and a flat effect, and reported "husband and her [sic] had a fight today and he called EMS so they would lock her up" (R. at 301).  She denied abusing her prescription medications, and said she drank alcohol only (R. at 309).  After a brief stay in the emergency room, Plaintiff was assessed by the

---

[5]      Although she was treated periodically with Ativan during hospitalizations, it does not appear from the record that this drug was prescribed as a regular part of her drug treatment regimen subsequent to Dr. Allen's refusal to prescribe it.  Based on Plaintiff's later admissions, it appears that she may have obtained this drug as a street drug.

hospital's psychiatric staff as being at no risk of harm to herself, and was discharged from the hospital in the care of her husband (R. at 304).

Plaintiff met with a psychotherapist from Greene County Mental Health Center on May 13, 2003 (R. at 402).  She denied abusing prescription medications, and agreed to attend group counseling sessions.  Id.

On May 16, 2003, Plaintiff received a Core Psychiatric Evaluation at Greene County Mental Health Center (R. at 400).  She was noted to have abused alcohol, cocaine, and "benzos" [Ativan and Lortab].  Id.  The psychotherapist observed Plaintiff was "nervous and angry…arguing with husband, but assessed her as having "good critical thinking, with no psychotic behavior or obsessive/compulsive disorder."  Id.  Plaintiff was assessed as alert and oriented, with comprehension and memory intact, and normal intelligence.  Id.

Plaintiff was examined by treating cardiologist, Dr. Cohen, on May 19, 2003 (R. at 324-325).  Her physical examination was normal, except for elevated blood pressure (R. at 325).  Dr. Cohen added a blood pressure drug, Hydroclorothiazide, to Plaintiff's treatment regimen.  Id.

Four days later, on May 23, 2003, Plaintiff was examined by her primary care physician, Dr. Mustafa (R. at 384).  The doctor noted Plaintiff was "down on her alcohol intake."  Id.  Her physical examination was unremarkable, and the doctor assessed Plaintiff as being in improved health. Id.

On May 27, 2003, Plaintiff was consultatively examined by psychologist Dr. John Seltenreich (R. at 178-181).  Dr. Seltenreich noted Plaintiff told him she had been treated at Columbia Memorial Hospital for depression in 2002, and was currently treated on an outpatient basis at Greene County Mental Health Center for alcohol and drug use (R. at 178). Plaintiff told Dr. Seltenreich she had been depressed, but was improving (R. at 179).  During Plaintiff's mental status examination, the doctor noted she was cooperative and showed adequate social skills.  Id.  Plaintiff also showed adequate language skills, and her thought processes were coherent and goal directed, with no evidence of hallucinations, delusions, or paranoia (R. at 180).  She was oriented to person, time and place, and her attention and concentration were intact.  Id.  Recent and remote memory skills were intact, and the doctor assessed Plaintiff's intellectual functioning in the average range.  Id.  Plaintiff reported she was independent in her activities of daily living, and her interests included reading, swimming, dancing, and playing cards.  Id.  In his medical source statement, Dr. Seltenreich assessed Plaintiff as able to follow and understand simple directions and instructions, as well as able to perform simple and rote tasks under supervision.  Id.  However, the doctor also noted Plaintiff may have some problems maintaining attention and concentration, and may not always consistently perform simple tasks.  Id.  Dr. Seltenreich opined Plaintiff has the ability to learn new tasks, but may not be able to perform complex tasks independently.  Id.  He further noted Plaintiff may have problems relating adequately with others, especially in large group

situations (R. at 181).  Dr. Seltenreich recommended Plaintiff continue on with her treatment for alcohol and drug dependence, and that she continue on with her vocational involvement.  Id.

Also on May 27, 2003, Plaintiff was consultatively examined by Dr. Assim Yousef (R. at 182-186).  Plaintiff's physical examination revealed normal results, although in his medical source statement, Dr. Yousef opined Plaintiff "is restricted from activities requiring mild or greater exertion because of [her] cardiac condition," and "she has a marked restriction for heavy lifting and carrying because of low back pain" (R. at 185).

On June 4, 2003, Plaintiff was transported by ambulance to Columbia Memorial Hospital after an automobile accident (R. at 443-467).  She complained of back pain and a headache (R. at 443).  Plaintiff was discharged from the hospital the same day after x-rays, blood tests, and urinalysis failed to reveal significant results (R. at 452-467).  She was instructed to follow up with her primary care physician within two to four days after discharge from the emergency room (R. at 449).

Plaintiff underwent a nuclear stress test to check her cardiac function on June 12, 2003 (R. at 322-323).  The test was negative at 77 percent of her predicted maximum heart rate (R. at 323).

On June 18, 2003, Plaintiff was transported by ambulance to the emergency room of Benedictine Hospital after her husband reported finding her semi-conscious and flailing about on the floor of her home (R. at 194-216).  Plaintiff's husband told the emergency room physician that Plaintiff

16

"may have overdosed on Ambien and Ativan" (R. at 196).  However, blood and urine toxicology tests were negative for alcohol and prescription or illicit drugs (R. at 202).  Plaintiff's consulting neurologist, Dr. Fabio Danisi, noted a "differential diagnosis of seizure disorder vs. psychogenic seizure" and opined that "if this patient had a seizure, it might have either been secondary to a small focus in the brain or secondary to withdrawal from benzodiazepine or other antiepileptic drug" (R. at 197).  Dr. Danisi ordered a CT scan of Plaintiff's head which revealed normal results (R. at 214).  Plaintiff also underwent an MRI of the brain, and an EEG, and both tests were normal (R. at 194).  Plaintiff was released from Benedictine Hospital on June 26, 2003, with a regimen of drugs that included psychotropic medications, anti-seizure and anti-epilepsy drugs, and pain medication (R. at 194-195).

On June 23, 2003, State agency physician, Dr. Alan Auerbach, evaluated Plaintiff's medical records and opined she was capable of performing the requirements of medium work (R. at 187).

State agency psychologist, Dr. Ann Herrick, completed a Mental Residual Functional Capacity assessment of Plaintiff on June 26, 2003 (R. at 217-234).  Dr. Herrick opined Plaintiff had mild to moderate limitations in her mental residual functional capacity, but would be capable of work-related activity (R. at 219, 231).

Plaintiff was transported by ambulance to Columbia Memorial Hospital on June 28, 2003, after appearing confused, agitated and combative to her family (R. at 235-257).  Upon admission to the medical unit of the

hospital, Plaintiff was assessed by Dr. Lore Lisa Garten as being in an acute confusional state (R. at 237).  Plaintiff again underwent physical examinations, blood tests, urinalysis, x-rays, and a CT scan of her head (R. at 245-251).  The results of examinations, tests, x-rays, and CT scan were normal, except for an elevated white blood cell count.  Id.  On July 1, 2003, Plaintiff was transferred from the medical unit of the hospital, to the psychiatric unit, for further evaluation (R. at 253).  Consulting psychiatrist Dr. Richard Plotkin examined Plaintiff's mental status and found her to be lethargic, disoriented as to place and time, and only minimally cooperative (R. at 252-253).  He noted Plaintiff's thought processes were disorganized, and her long-term, short-term, and immediate memory and judgment were severely impaired (R. at 253).  Dr. Plotkin assessed Plaintiff as suffering from delirium, and concluded that some of her medications were probably responsible for her state.  Id.  He discontinued Plaintiff's anti-epilepsy drugs and Ativan, and noted dramatic improvement in Plaintiff's mental status.  Id. Because a seizure disorder had not been fully ruled out, Plaintiff was continued on a lower dose of anti-seizure medication.  Id.  Plaintiff was discharged from Columbia Memorial Hospital on July 7, 2003 (R. at 253-254). At the time of discharge, she was fully oriented, alert and attentive, with no apparent symptoms of delirium (R. at 253).

On July 9, 2003, Plaintiff was examined by Dr. Mustafa (R. at 383). Her physical examination was unremarkable except for an injury to her left foot.  Id.

Plaintiff was re-admitted to Columbia Memorial Hospital on July 17, 2003, complaining of new seizures, shakiness, and numbness in her arm, face and hands (R. at 471-479).  Blood tests were ordered, and Plaintiff underwent another CT scan of her head (R. at 473).  No clinical abnormalities were noted in Plaintiff's physical examination, blood work, or CT scan (R. at 474).  Plaintiff was released from the hospital on July 18, 2003.  Id.

On September 3, 2003, Plaintiff was referred to Stony Lodge Hospital by the emergency room staff at Columbia Memorial Hospital when Plaintiff was taken to the emergency room hearing voices, and flailing and yelling (R. at 267).  During Plaintiff's psychiatric evaluation, it was noted she was cooperative, but claimed to have panic attacks when she was left alone. Id.  Plaintiff told the intake counselor she did not understand why she was transferred to a psychiatric hospital after she had a seizure.  Id.  Plaintiff was discharged from Stony Lodge Hospital on September 5, 2003 (R. at 265). Upon discharge, her therapist noted Plaintiff was cooperative and participated in both individual and group therapy while in the hospital.  Id.  Plaintiff was able to explore healthy coping strategies for her symptoms, and was encouraged to go back to work in some capacity.  Id.

Plaintiff was transported to the emergency room of Columbia Memorial Hospital on September 19, 2003, after she was found slumped over in her car (R. at 283-288).  The doctor noted she had twitching in her face and

upper extremities, but assessed it was not true tonic-clonic motion[6] (R. at 285).  Plaintiff's physical examination was unremarkable, and her blood work and urinalysis revealed no reasons for her distress (R. at 286-287).  Plaintiff was medicated with Benedryl, Haldol, and Ativan, and her symptoms rapidly ceased (R. at 287).  She was discharged from the hospital in the care of her husband during the evening of the day she arrived (R. at 288).

On October 7, 2003, Plaintiff was examined by treating neurologist Dr. Fabio Danisi (R. at 313-314).  Plaintiff's neurological examination was entirely unremarkable, except for minimal proptosis bilaterally (R. at 314).  Dr. Danisi's impression was that Plaintiff was affected by pseudoseizures[7], given the atypical presentation of her episodes, as well as her normal CT scans and EEGs.  Id.  The doctor suggested Plaintiff's first episode may have been the result of withdrawal from benzodiazepines, which would include Ativan and Lortab.  Id.  He also opined Plaintiff might have restless leg syndrome, which would cause insomnia.  Id.

Plaintiff's treating cardiologist, Dr. Gary Cohen, examined her on October 27, 2003 (R. at 320-321).  While Plaintiff complained of chest pain, her physical examination was unremarkable.  Id.  The doctor noted Plaintiff

---

[6] A generalized tonic-clonic seizure is a seizure involving the entire body, which usually involves muscle rigidity, violent muscle contractions, and loss of consciousness.  Generalized tonic-clonic seizures (also called grand mal seizures) are the type of seizure that most people associate with the term "seizure," convulsion, or epilepsy. They may occur in people of any age, as a single episode or as a repeated, chronic condition (epilepsy).  See http://www.nlm.nih.gov/medlineplus/ency/article/000695.htm.

[7]A pseudoseizure is an attack resembling an epileptic seizure but having purely psychological causes, lacking the electroencephalographic changes of epilepsy, and sometimes able to be stopped by an act of will.  See http://www.medicaldictionary.thefreedictionary.com/pseudoseizure.

has chest pain syndrome, but no ischemia (R. at 321).  After the examination, Dr. Cohen completed a Physical Residual Functional Capacity report (R. at 315-319).  The doctor opined Plaintiff had no limitations on her ability to lift and carry objects, no limitations on her ability to sit, stand, walk, or push and pull, and no postural, manipulative, communicative, or environmental limitations (R. at 318).

Plaintiff's primary care physician, Dr. Mustafa, completed a Physical Residual Functional Capacity report on November 10, 2003 (R. at 378-382).  Like Dr. Cohen, Dr. Mustafa opined Plaintiff had no significant limitations of her physical residual functional capacity (R. at 381-382).

On November 26, 2003, Plaintiff underwent a psychiatric examination with consultative examiner Dr. Annette Payne (R. at 411-415).  During the mental status examination, Dr. Payne noted Plaintiff was cooperative, with adequate social skills (R. at 413).  Plaintiff's speech was fluid and clear with adequate language skills.  Id.  Her thought processes were coherent and goal-directed with no evidence of hallucinations, delusions, or paranoia.  Id.  Plaintiff's mood and affect were anxious and depressed, but she was alert and oriented to person, time, and place.  Id.  Dr. Payne assessed Plaintiff's attention and concentration, and recent and remote memory skills, as mildly impaired, and her cognitive functioning in the low average range (R. at 414).  In her medical source statement, Dr. Payne opined Plaintiff could follow and understand simple directions, and perform simple rote tasks, but would have difficulty with tasks that require attention

and concentration.  Id.  The doctor noted Plaintiff would have trouble performing complex tasks, making appropriate decisions, and relating with others.  Id.  Dr. Payne opined Plaintiff's psychiatric problems were moderately limiting, but that Plaintiff would benefit from vocational rehabilitation (R. at 415).

On December 8, 2003, a State agency consultant completed a Physical Residual Functional Capacity report of Plaintiff's ability to do work-related activities and, relying on the reports by Plaintiff's treating cardiologist, assessed Plaintiff as capable of performing the demands of medium work (R. at 416-421).

On December 9, 2003, a State agency physician, Dr. Abdul Hameed, completed a Psychiatric Review Technique assessment of Plaintiff's mental limitations, and determined her condition did not meet a listing as required by 20 C.F.R. Part 4, Subpart P, Appendix 1 § 12.00 (R. at 422-435). Dr. Hameed then completed a Mental Residual Functional Capacity Assessment and opined Plaintiff would be moderately limited in her abilities to carry out detailed instructions, maintain attention and concentration for extended periods, and work at a consistent pace during a normal work-day or workweek (R. at 436-437).

On January 25, 2004, Plaintiff went to the emergency room of Benedictine Hospital showing signs and symptoms of narcotic withdrawal (R. at 480-497).  She admitted to a three-year history of using Ativan, Ambien, Lortab, and methadone, along with her regular prescriptions, although blood

tests showed only a positive result for opiates (R. at 482, 487, 490).  Plaintiff was diagnosed with polysubstance abuse, and she requested admission to an outpatient drug and alcohol rehabilitation program (R. at 487, 497).  Because she was not in acute medical withdrawal, Plaintiff was discharged from the hospital emergency room the same day in stable condition.  Id.

Plaintiff telephoned her therapist at Greene County Mental Health Center, Alicia Weiss, on January 27, 2004, and told Ms. Weiss that she had been using methadone and wanted to enter a detoxification program (R. at 500).  Ms. Weiss noted that she spoke with Plaintiff's daughter, who told her that in addition to methadone, Plaintiff was also using Ativan and other drugs.  Id.  Plaintiff's daughter told Ms. Weiss that "for a long time, she fooled us all."  Id.

On February 6, 2004, Ms. Weiss closed Plaintiff's case at Greene County Mental Health Center after noting Plaintiff had abused drugs throughout the time she was treated at the center (R. at 509).  Ms. Weiss noted Plaintiff would receive no further services from the center until her detoxification and rehabilitation was complete (R. at 498, 499, 509).  This was the last medical entry in Plaintiff's record available to the ALJ at the time of his decision.

On May 5, 2005, Dr. Danisi prepared a prescription slip for Plaintiff that stated she had epilepsy and could not drive (R. at 521).

Plaintiff underwent an MRI examination of her brain on May 24, 2005 (R. at 527). The radiologist noted the result of this MRI was the same as the normal MRI that had been performed in June 2003. Id.

On June 15, 2005, Plaintiff underwent a sleep study to diagnose possible sleep apnea (R. at 522-524). The result of the sleep study was negative, and the EEG did not reveal any epileptiform brain wave activity. Id.

Plaintiff underwent an ambulatory EEG on June 15, 2005 (R. at 528). The results of the test were normal. Id.

From August 8, 2005, through August 10, 2005, Plaintiff underwent chronic video monitoring for seizure activity (R. at 530-532). During the study, Plaintiff was noted to have no abnormal sleep behavior, and no epileptiform activity (R. at 532). The test revealed normal brain wave activity with no evidence of seizures or pseudoseizures. Id. This is the last medical report in Plaintiff's record.

**Plaintiff's First Challenge: The ALJ Misstated the Findings of the Psychiatric Consultative Examiner**

12. Plaintiff challenges the ALJ's decision, claiming the ALJ misstated the findings of Dr. Seltenreich by ignoring and/or omitting the psychologist's opinion that Plaintiff "may have some problems maintaining attention and concentration for tasks and may not always consistently perform simple tasks." See Plaintiff's Brief, p.1. Plaintiff avers that by ignoring and/or omitting part of Dr. Seltenreich's opinion, the ALJ engaged in a "selective review" of the evidence. Id. The Court disagrees with Plaintiff's claim as it is

clear from the ALJ's decision that he neither ignored, nor omitted, Dr. Seltenreich's statement from his discussion of the medical information.

Plaintiff cites Shine v. Barnhart, a case in which the plaintiff had limitations from drug and alcohol abuse, as support for her contention that this case should be reversed and remanded to the Commissioner for a new hearing.  See Shine v. Barnhart, No. 3:02CV11482JCH (April 5, 2004); U.S. Dist. Lexis 6588.  However, the facts surrounding the reversal and remand to the Commissioner in the Shine v. Barnhart case differ dramatically from the case at bar.  Id.  In Shine v. Barnhart, the ALJ failed to discuss in his decision the reports and opinions of Plaintiff's treating psychologists and psychiatrists, and relied primarily on the assessments of non-treating and non-examining consultants, when making his finding that the plaintiff retained the residual functional capacity to engage in the demands of light work.  Thus, the Shine court ruled the ALJ had failed to follow the "treating physician's rule,"[8] and, because he did not consider and discuss the opinions of the plaintiff's treating physicians, his decision was not based on the substantial evidence of record. Id.

In this case, Dr. Seltenreich was a consultative psychiatric examiner, and not Plaintiff's treating physician.  However, the ALJ's decision shows he gave careful consideration to the entire opinion of Dr. Seltenreich, including the psychologist's statement that "[Plaintiff] may have some problems maintaining attention and concentration for tasks and may not

---

[8] "The 'treating physician's rule' is a series of regulations set forth by the Commissioner in 20 C.F.R. SS 404.1527 detailing the weight to be accorded a treating physician's opinion." de Roman v. Barnhart, No.03-Civ.0075(RCC)(AJP), 2003 WL 21511160, at *9 (S.D.N.Y. July 2, 2003).

always consistently perform simple tasks" (R. at 16, 180).  As an example, the

ALJ cited Dr. Seltenreich's opinion that Plaintiff's:

> Mental status examination was notable for fluent and clear speech,
> with adequate expressive and receptive language functioning; her
> gait and posture were normal as was her motor behavior and she
> made appropriate eye contact; thought processes were coherent
> and goal directed with no evidence of hallucinations, delusions,
> paranoia; affect dysphoric; mood dysthymic; sensorium notable for
> some blurry vision; oriented to person, place, and time; attention
> and concentration intact; recent and remote memory skill grossly
> intact; intellectual functioning appeared to be in the average range;
> and insight and judgment were fair.  Dr. Seltenreich opined that
> [Plaintiff] was able to follow and understand simple directions and
> instructions as well as perform simple and rote tasks under
> supervision; *she may have some problems maintaining attention
> and concentration for tasks and may not always consistently
> perform simple tasks*;[9] she is able to learn new tasks and may not
> be able to perform many complex tasks independently; she does
> not always make appropriate decisions independently; she has
> some problems relating adequately with others, especially in large
> group situations; and she has some problems dealing with stress.
> (R. at 16, 179-181)

Further, it is unlikely Dr. Seltenreich intended his statement that "[Plaintiff]

may have some problems maintaining attention and concentration for tasks

and may not always consistently perform simple tasks," to suggest that

Plaintiff was unable to engage in the demands of the world of work, as Dr.

Seltenreich recommended that "[Plaintiff] should continue on with her

vocational involvement" (R. at 181).

Additionally, the ALJ considered the opinion of consulting

psychiatric examiner, Dr. Annette Payne, who examined Plaintiff in November

2003, approximately six months after Dr. Seltenreich completed his

examination (R. at 411-415).  Dr. Payne's assessment of Plaintiff's abilities

---

[9] Italics added.

and limitations is in substantial agreement with the assessment Dr.

Seltenreich (R. at 178-181).  While Dr. Payne found Plaintiff's attention and

concentration, as well as recent and remote memory skills, to be mildly

impaired, she opined:

> [Plaintiff] could follow and understand simple directions and
> instructions.  She could perform simple rote tasks.  She could
> consistently perform simple tasks.  She has problems with attention
> and concentration, and learning new tasks.  She has difficulties
> performing complex tasks, and making appropriate decisions.  She
> has difficulties relating with others and dealing with stress.  Her
> psychiatric difficulties are moderately limiting.
> (R. at 413-414).

Like Dr. Seltenreich, Dr. Payne thought Plaintiff could benefit from vocational

rehabilitation (R. at 181, 415).

Based on the foregoing, the Court finds the ALJ did not ignore or

omit the opinion of Dr. Seltenreich when evaluating Plaintiff's medical

evidence in his decision.  Instead, the ALJ gave careful consideration to the

full evaluation of Plaintiff by Dr. Seltenreich, as well as to a later, substantially

similar evaluation completed by Dr. Payne.

**Plaintiff's Second Challenge:  The Appeals Council Did Not
Vacate the ALJ's Decision and Remand the Matter for Further
Administrative Proceedings Upon Receipt of Dr. Danisi's Note
That Plaintiff Has Epilepsy**

13.    Plaintiff's second challenge to the final decision of the

Commissioner in this case is that the Appeals Council failed to vacate the

ALJ's decision and remand the case for further administrative proceedings

based upon the receipt of a note on a prescription pad from Plaintiff's treating

physician, Dr. Danisi, dated May 5, 2005, that states "[Patient] has epilepsy

and cannot drive.  She will need transportation for medically necessary testing and doctor appointments" (R. at 521).  <u>See</u> Plaintiff's Brief, p. 2. Accompanying this note were other prescription pad notes ordering a 24 hour EEG, a sleep study, and a referral to a pain management clinic (R. at 521). The Appeals Council confirmed that it had received this information, along with the results of the various tests and studies ordered, when it denied Plaintiff's request for review of the ALJ's decision on December 30, 2005 (R. at 4-8).

Guidance is given to the Appeals Council for handling evidence submitted after an ALJ's decision is issued in <u>HALLEX, the Hearing, Appeals, and Litigation Manual</u> published on-line by the Social Security Administration's Office of Disability Adjudication and Review.  <u>See</u> http://www.ssa.gov/OP_Home/hallex.html.  In general, "When a claimant or representative submits additional evidence, it must be both new and material to warrant the Appeals Council's consideration.  Evidence is new when it is not duplicative, cumulative or repetitive, and it is material when it affects the ALJ's findings or conclusions <u>and</u> relates to the time [period on or before the date of the ALJ's decision]…When new and material evidence has been submitted with a request for review, the analyst will apply the weight of the evidence rule instead of the substantial evidence rule in deciding whether to recommend review action to the Appeals Council."  <u>See</u> http://www.ssa.gov/OP_Home/hallex/I-03/I-3-3-6.html.  In its fiscal year 2005 Performance and Accountability Report, the Social Security Administration

explained its view of the difference between substantial evidence and weight of evidence by stating, "Substantial evidence is defined as evidence, which, although less than a preponderance, nevertheless is sufficient to convince a reasonable mind of the credibility of a position taken on an issue, when no evidence on the opposing side clearly compels another finding or conclusion. The 'substantial evidence rule' requires less in support of a finding or conclusion than the 'weight of evidence rule.'  Evidence on one side of an issue need not possess greater weight or be more convincing and credible to be 'substantial.'"  See SSA's FY 2005 Performance and Accountability Report, p. 76.

When new evidence is submitted to the Appeals Council with a request to review an ALJ's decision, an Appeals Council analyst must determine if the evidence is: (a) both new and material, (b) new, but not material, or (c) neither new nor material.  The analyst must also consider whether or not the evidence concerns both the issues and the time period considered by the ALJ.  See http://www.ssa.gov/OP_Home/hallex/I-03/I-3-5-20.html.

While the Court has examined Plaintiff's new evidence and recognizes it may be pertinent to the issues considered by the ALJ, it is not material because it does not pertain to the time frame relevant to Plaintiff's claim.  Dr. Danisi's note on a prescription pad was written approximately six months after the ALJ issued his decision, and a full 15 months after the date of Plaintiff's last medical record (the termination of her case by Greene

County Mental Health Center) submitted to the ALJ for consideration in his decision (R. at 498, 499).  Further, Dr. Danisi's note contradicts his earlier opinions.  As an example, when he examined Plaintiff on June 20, 2003, he noted Plaintiff has "no known risk factors and no history of epilepsy in the family…Differential diagnosis is seizure disorder vs. psychogenic seizure.  If this patient had a seizure, it might have been either secondary to a small focus in the brain or secondary to withdrawal from benzodiazepine or other antiepileptic drug" (R. at 197).  Plaintiff's physical examination was unremarkable, as were the CT scan and MRI of her brain (R. at 194, 196-197, 214).

Dr. Danisi examined Plaintiff again on October 7, 2003 (R. at 313-314).  Once again the doctor noted Plaintiff's general physical examination was unremarkable, and her neurological examination was "entirely unremarkable except for minimal proptosis bilaterally" (R. at 314).  Dr. Danisi's impression was the Plaintiff suffered from pseudoseizures, as her EEG was not consistent with epileptiform activity.  Id.

Further, the results of additional tests and studies of Plaintiff's brain activity completed in May, June, and August 2005 at Dr. Danisi's request, showed normal results with no evidence of epileptiform activity (R. at 522-524, 527, 528, 530-532).  In fact, these test results refute Dr. Danisi's diagnosis of epilepsy.

After review of Plaintiff's entire record, including all evidence submitted to the Appeals Council after the date of the ALJ's decision, the

Court finds the Appeals Council followed its published procedures for reviewing evidence submitted after the date of the ALJ's decision, evaluated the evidence for its materiality to the time frame on or before the ALJ's decision, and properly concluded Plaintiff's new evidence was not of sufficient weight to warrant review of the ALJ's decision.

### Plaintiff's Third Challenge: The ALJ Ignored Clear Evidence of a Seizure Disorder or Mental Decompensation

14.     Plaintiff's third challenge to the ALJ's decision is that the ALJ ignored clear evidence of her seizure disorder or decompensation.  See Plaintiff's Brief, p. 2.  Plaintiff points to her frequent hospitalizations as proof that she has a mental or organic disorder that may satisfy a listing at 20 C.F.R. Part 4, Subpart P, Appendix 1 § 12.00.

The evidence shows that Plaintiff was hospitalized six times in the time frame from April 28, 2003, through January 25, 2004.  However, during these hospitalizations, Plaintiff was never conclusively diagnosed with a seizure disorder.

As an example, Plaintiff was admitted to Columbia Memorial Hospital on April 28, 2003, after she drank wine with Ativan and Celexa (R. at 300-312).  She was stabilized and discharged from the hospital the following day.  Id.

Plaintiff was hospitalized at Benedictine Hospital on June 19, 2003, with questionable seizure activity (R. at 194-216).  Over a period of seven days, Plaintiff was examined by several physicians, and underwent extensive testing including a CT scan and MRI of her brain.  Id.  The results of Plaintiff's

31

examinations and tests were unremarkable, and a seizure disorder, or epilepsy, were unconfirmed (R. at 194).

Plaintiff was hospitalized for a third time on June 28, 2003, when she was admitted to Columbia Memorial Hospital in an acute confusional state (R. at 236-257).  Once again, Plaintiff was examined by several physicians, and underwent extensive testing, including a new CT scan and MRI of her brain.  Id.  When the medical unit of the hospital could not find a reason for her mental status, she was transferred to the hospital's psychiatric unit.  Id.  Plaintiff was diagnosed by her attending psychiatrist with delirium, secondary to medication adjustment and/or withdrawal (R. at 253).  Plaintiff's psychiatrist adjusted her medications, and her condition rapidly improved.  Id.  In his discharge notes, Plaintiff's psychiatrist recorded "[Neurology] is not clear whether the patient has a seizure disorder."  Id.

Plaintiff was admitted to Columbia Memorial Hospital again on July 17, 2003, claiming she had had a seizure, followed by numbness and tingling in her hands, arm, and face (R. at 471-479).  Once again, Plaintiff received a physical examination, blood and other laboratory work, and a CT scan of her brain.  Id.  All examinations and tests were unremarkable, and Plaintiff was discharged from the hospital the day after her admission.  Id.

Plaintiff's fifth hospitalization during the relevant time frame began on September 3, 2003, when she was admitted to a psychiatric facility, Stony Lodge Hospital (R. at 265-282).  Plaintiff claimed to have had a seizure, but upon admission to the hospital, she was noted to be having audio and visual

hallucinations, and responding to internal stimuli (R. at 267-268, 278).  During

her hospitalization, Plaintiff admitted to consuming alcohol with her

prescription drugs (R. at 272).  Her condition improved rapidly, and Plaintiff

participated in individual and group therapy (R. at 265).  Plaintiff was released

from Stony Lodge Hospital on September 5, 2003.  Id.

Plaintiff was admitted to Columbia Memorial Hospital on September

19, 2003, after she was found slumped over in her van (R. at 283-297).  Upon

admission to the hospital, Plaintiff was combative and confused (R. at 283).

The admitting physician observed Plaintiff had twitching of her face and upper

extremities, but noted the twitches were not of the tonic-clonic (epilepsy) type

(R. at 285).  Plaintiff was medicated with Benedryl, Ativan, and Haldol, and

released the same day (R. at 287).

According to the medical information contained within Plaintiff's

record, her last admission to a hospital during the relevant time frame

occurred on January 25, 2004, when she went to Benedictine Hospital with

extreme thirst and poor appetite, and asked to be admitted to the New Vision

Program for drug and alcohol rehabilitation (R. at 480-497).  Plaintiff admitted

that she used Ativan, Ambien, Lortab, and methadone, in addition to her

regular prescription medications, and requested help for her substance

abuse.  Id.  She described a three-year history of opiate abuse, and reported

she was taking 15 pills daily (R. at 487).  While at the hospital, Plaintiff was

examined and given blood tests that were positive for methadone.  She was

released from Benedictine Hospital the same day with instructions to follow up with the New Vision Program (R. at 488).

It is clear from Plaintiff's history of hospitalizations, as well as from her medical history detailed in Section 10 above, that she has not been diagnosed with a seizure disorder.  Plaintiff has been hospitalized numerous times, and has undergone a plethora of tests and examinations by different treating and consulting physicians, yet the results from nearly all of these tests and examinations have been unremarkable.  However, the ALJ recognized that Plaintiff may have had seizures associated with her "unremitting substance addiction" (R. at 21).  To accommodate the possibility that Plaintiff might have a seizure in the future, the ALJ found she could work only in a hazard-free and temperature-controlled environment (R. at 26).

15.     As discussed above, the ALJ found that Plaintiff had depression as well as alcohol and substance abuse, which he found were severe impairments. (R. at 19, 24).  Under the Act, a finding of disability is barred if the alcoholism or drug addiction is a "contributing factor material to" the determination of disability.  42 U.S.C. § 423(d)(2)(c), and 20 C.F.R. § 416.935(a).  The ALJ found that Plaintiff's substance abuse met the criteria of section 12.09 set forth in Appendix 1 of 20 C.F.R., Part 404, Subpart P ("the Listings"). However, the ALJ found that even absent the effects of Plaintiff's alcohol and substance abuse, Plaintiff's impairments would not meet or equal the criteria of a listed impairment. (Tr. 21).[10]

---

[10] If there is medical evidence of a claimant's drug addiction or alcoholism, the ALJ must determine if the drug addiction or alcoholism is a contributing factor material to the determination of disability.  The key

With respect to Plaintiff's claim that she established clear evidence of decompensation, the Court notes the ALJ recognized that Plaintiff may have had one or two episodes of decompensation (R. at 21).  However, in his analysis of Plaintiff's mental impairment, the ALJ noted that even when not considering the effects of Plaintiff's drug and alcohol addiction, Plaintiff failed to show the severity of an affective disorder, or anxiety-related disorder, required to meet the "A" criteria of 20 C.F.R. Part 4, Subpart P, Appendix 1 §§ 12.04 and 12.06.  Further, the ALJ found Plaintiff failed to meet the "B" criteria of 20 C.F.R. Part 4, Subpart P, Appendix 1 §§ 12.04 and 12.06, because absent the effects of her substance addiction, and allowing for one or two episodes of decompensation, Plaintiff had no more than moderate restriction in her activities of daily living, moderate difficulties in her social functioning, moderate difficulties in maintaining concentration, persistence, and pace (R. at 21).

Thus, the Court finds the ALJ properly considered Plaintiff's evidence concerning her alleged seizure disorder, as well as the documented evidence of possible episodes of decompensation, and found that absent Plaintiff's admitted drug and alcohol abuse, neither of these conditions would render Plaintiff totally disabled under the requirements of the Act.

**Plaintiff's Fourth Challenge:  The Hearing Transcript Contains Sections Marked "Inaudible"**

16.    Plaintiff's fourth challenge to the ALJ's decision is that sections in the transcript of Plaintiff's hearing are marked "inaudible," including sections

factor the ALJ will examine is whether or not the claimant would still be disabled if he or she stopped using drugs or alcohol.  See 20 C.F.R. §§ 404.1535 and 416.935.

of the testimony by the vocational expert.  <u>See</u> Plaintiff's Brief, p. 2. Because

of the "inaudible" sections, Plaintiff claims difficulty in preparing the Plaintiff's

Brief.  <u>Id</u>.

   The Court has carefully examined the hearing transcript and agrees

with Plaintiff that the "inaudibles" are annoying (R. at 539-581).  However,

most of the "inaudibles" are single words that were not clear to the

transcriber, and do not include large sections of testimony, or even full

questions or responses.  When reading the transcript, the Court had little

difficulty understanding either the questions or the answers, because the

context of both questions and answers were clear.

   Thus, the Court will not remand this matter to the Commissioner for

a new hearing based on some "inaudible" words that appear in the transcript

of the hearing.

## Conclusion

17. After carefully examining the administrative record, the Court finds

substantial evidence supports the ALJ's decision in this case, including the

objective medical evidence and supported medical opinions.  It is clear to the

Court that the ALJ thoroughly examined the record, afforded appropriate

weight to all the medical evidence, including Plaintiff's treating physicians,

and consultative examiners, and afforded Plaintiff's subjective claims of pain

and limitations an appropriate weight when rendering his decision that Plaintiff

is not disabled.  The Court finds no reversible error, and further finds that

substantial evidence supports the ALJ's decision. Accordingly, the Court

grants Defendant's Motion for Judgment on the Pleadings and denies Plaintiff's motion seeking the same.

IT IS HEREBY ORDERED, that Defendant's Motion for Judgment on the Pleadings is GRANTED.

FURTHER, that Plaintiff's Motion for Judgment on the Pleadings is denied.

FURTHER, that the Clerk of the Court is directed to take the necessary steps to close this case.

SO ORDERED.

Dated:  June 2, 2008
        Albany, New York

Victor E. Bianchini
United States Magistrate Judge